<u>**\*NOT FOR PUBLICATION\***</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

MARK GRECO,                          :
                                  :

           Plaintiff,            :

                                  :

v.                                   :                    **OPINION**

                                  :     Civil Action No. 09-967 (FLW)

T-MOBILE, USA,                       :

                                  :

           Defendant.           :

_____:

<u>**WOLFSON, United States District Judge**</u>:

This matter comes before the Court on a motion for summary judgment brought by Defendant T-Mobile, USA ("Defendant" or "T-Mobile").  Plaintiff Mark Greco ("Plaintiff" or "Greco") filed a three-count complaint against Defendant, his former employer, claiming: (1) age discrimination in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12; (2) that defendant created a hostile work environment based upon Defendant's age-based comments in violation of N.J.S.A. 10:5-12(a) and; (3) retaliation.  For the reasons that follow, Defendant's motion for summary judgment is granted.

### BACKGROUND

Plaintiff is a former Senior Business Analyst who worked for T-Mobile—a national provider of wireless voice, messaging, and data service.  *See* Defendant T-Mobile USA, Inc.'s

Fed.R.Civ.P. 56.1 Statement of Uncontested Material Facts, ¶ 1 ("Def. SOMF").[1]  Plaintiff was 49-years-old when he was hired by T-Mobile, and 51-years-old when he was terminated.  *See id.* at ¶ 2.  At the time Plaintiff was hired, T-Mobile had a "zero tolerance policy prohibiting discrimination (including age discrimination), harassment, and retaliation. . . ."  *See id.* at ¶ 21.  Plaintiff's tenure at T-Mobile was from March 13, 2006 to June 20, 2008.

In late 2005, Plaintiff obtained temporary placement at T-Mobile through InsPara Networking Technologies, a temporary employment agency.  *See id.* at ¶ 15.  In March of the following year, Raymond Nettleship hired Plaintiff, then 49, for permanent employment. *See id.* at ¶ 17.  Plaintiff commenced work as a Senior Business Analyst, reporting directly to Nettleship.  *See Id.*  His role was to act as the "communications link between T-Mobile's end users (business partners and customers) and its software developers (the employees tasked with creating the systems and solutions required by the end users)."  *See id.* at ¶ 18.

In the second quarter of 2006, Plaintiff received his first Quarterly Performance Review. While Nettleship noted that Greco is "appreciative of the team members he work [*sic*] with," Nettleship also found that Greco "needs to…be sure to modify his approach based on the people he was dealing with."  *See* Saloman Decl., Ex. 18 at 3-4.  On this Performance Review, Greco received an overall rating of 3.0 out of 5.0.  *See id.*  A 3.0 is defined as "Achieved Expectations." *See* Saloman Decl., Ex. 20, at 3.  In Greco's second Quarterly Performance Review for the third quarter in 2006, Nettleship raised concerns that Greco "has not made the professional

---

[1]  In Plaintiff's Response to Defendant's Statement of Uncontested Facts, Plaintiff contests many of the factual allegations set out by Defendant. Unless otherwise noted, this Court only cites to Defendant's Statement of Uncontested Facts when Plaintiff's response either admits or fails to deny the facts as described by Defendant, as "facts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted." *Hill v. Algor,* 85 F.Supp.2d 391, 408 n. 26 (D.N.J. 2000); *White v. Camden City Board of Education,* 251 F.Supp.2d 1242, 1246 n. 1 (D.N.J. 2003), *aff'd,* 90 Fed. Appx. 437 (3d Cir. 2004); *S.C. v. Deptford Township Board of Education,* 248 F.Supp.2d 368, 374 n. 3 (D.N.J. 2003).

relationships required to be successful in his position." *See* Saloman Decl., Ex. 19 at 9. Similarly, Nettleship noted that Plaintiff "does not always create win/win relationships with his customers. He needs to give more thought to his email communications which have resulted in some challenges this quarter." *Id.* at 4. However, like the second quarter performance review, there were several positive comments. *See id.* at 4 ("[Greco] is working hard to meet his comittments [*sic*].") Overall, Greco received an overall rating of 2.79[2] out of 5.0—a score slightly short of "Achieved Expectations." *See id.*

In Greco's Quarterly Performance Review for the fourth quarter of 2006, Nettleship commented that Greco "needs to take a closer look at his skills and talents and make sure he has an accurate picture of what they are specific to our environment. He has said on numerous occasions that he has strong database and software development skills but has not been able to convince his managers or peers." *See* Saloman Decl., Ex, 20 at 9. Nonetheless, Greco's overall rating went up from the previous quarter to a 3.0. *See id.*

In the fourth quarter performance review, Plaintiff expressed displeasure at the fact that a manager was hired to oversee the Business Analysts, including himself. *See id.* at 10. In the performance review, Plaintiff claimed that he was "led to believe" that this was a position for which he would be considered. *See id.* at 10. In this same performance review, Nettleship explained that Greco was not eligible for this position because "[t]he business need for this role is to have a heavy technical manager that can provide architecture guidance and interview and

---

[2] Plaintiff alleges that the rating was "this low only because of a data mapping error which was quickly corrected." *See* Pl. Resp. to Def. SOMF at ¶ 24. However, Plaintiff has provided no evidence to support this allegation. When a Plaintiff disagrees with statements made in a 56.1(a) Statement of Uncontested Facts, he "must identify the material fact it disputes and provide a citation to the affidavits and other documents in support of that position." *U.S. v. Brookman,* Civil Action No. 08-CV-5593, 2010 WL 1379808, *2 (D.N.J. Mar. 29, 2010). Accordingly, this Court takes that the information provided on the Performance Review as true.

hire other technical analysts. This does not fit with [Greco's] current experience and skill level." *See id.* at 11.  Further, Nettleship noted that he had not implied that Greco would be eligible for this role.  *See id.*  Plaintiff nonetheless alleges that he "should have been considered for [the] position."  *See* Pl. Resp. to Def. SOMF, ¶ 27.  However, Plaintiff also admitted during his deposition that he was not a "highly technical manager" and that the position did not fit with his experience and skill level at the time.  *See* Greco Dep. Tr. 224:8-17.

Before the new manager began working at T-Mobile, Nettleship completed Greco's Review for the first quarter of 2007, on which Greco received an overall rating of 3.6 out of 5, above the 3.0 threshold for "Achieved Expectations." *See* Cert. of Brian Cige, Ex. 2.  This was the last review of Greco's performance by Nettleship.

Atiq Hashmi was hired to fill the new management position and became Greco's direct supervisor in May 2007. *See* Def. SOMF, ¶ 28. Hashmi, in turn, reported to Nettleship. *See id.* On June 18, 2007, Nettleship emailed Hashmi, expressing concerns about Greco:

> I am hearing some disturbing things about Mark Greco's communications and general interaction with our team. I would like you to be deeply involved in the IA project and keep a very close eye on him. . . . I have asked Sandra to make sure your [*sic*] are invited to every meeting about the IA project and cancel them if you are not available.  Please make this a priority as I have reason to believe this is impacting the team overall.

*See* Saloman Decl., Ex. 21. On July 10, 2007, an Employee Corrective Action Notification for Mark Greco was issued.  *See* Saloman Decl., Ex. 21.  The memorandum noted, amongst other things, that: "[s]ome department members have observed non-cooperative interaction from [Greco];" "[Greco] disregarded directions as provided;" Greco "missed several meetings in the past without prior notification," and that Greco didn't respond to action items in a timely matter. *See* Saloman Decl., Ex. 22.  The next day, Hashmi met with Greco to discuss this document and

to counsel Greco. *See* Def. SOMF, ¶ 32.[3]  Greco secretly recorded this conversation.  *See id.* at ¶ 32.[4]  During the meeting, Greco told Hashmi that Greco was "surprised [Hashmi] lasted" in a management position.  *See* Saloman Decl., Ex. 23.[5]  Greco alleges that at the end of this meeting, Hashmi asked him "if the problem [was] related to [Greco] being older than [Hashmi]" and having to report to a "younger person."  *See* Def. SOMF, ¶ 109.  Defendant contends that Hashmi "merely observed that Greco had more tenure and experience at T-Mobile than Hashmi."  *See id.* at ¶ 110.  In a subsequent meeting between the two, which Greco again secretly recorded, Hashmi noted that "[m]y point was I have sometimes referred to you as being here longer than me."  *See* Saloman Decl., Ex. 38, 22:11-12.

The only other age-based comment that Greco alleges is a statement made by Nettleship during a T-Mobile meeting.  *See* Def. SOMF, ¶ 112.[6]  At the meeting, while operating a projector, Nettleship asked the crowd whether he should "increase the font size for those of us over forty."  *See* Greco Cert., ¶ 20.  Notably, Nettleship himself is over 40.  Greco admitted, at

---

[3] In Plaintiff's Response to Defendant's Statement of Material Facts, Plaintiff is silent as to Defendant's allegation that this meeting occurred, or that he recorded it.  *See* Pl. Resp. to Def. SOMF ¶ 32.  As Plaintiff fails to rebut Defendant's allegation, this fact is taken as true.  *U.S. v. Brookman,* 2010 WL 1379808 at*2.

[4] Plaintiff does not respond to Defendant's allegation that he secretly recorded the meeting with Hashmi.  *See* Pl. Resp. to Def. SOMF ¶ 32.  Further, Defendant provides a transcript of this recording. *See* Saloman Decl., Ex. 23. Accordingly, Defendant's allegation that this meeting was secretly recorded is taken as true.

[5] Plaintiff contends that the recording "confirms rightfulness [sic] of need to document unfair and illegal treatment" by Hashmi because "Hashmi admits making age related comments and confirms Plaintiff's concerns/complaints about age discrimination, as a motivation for his maltreatment before being fired."  *See* Pl. Resp. to Def. SOMF at ¶ 33.  However, Plaintiff provides no record support for this proposition.

[6] The parties do not indicate the date of this meeting.

his deposition, that he "originally" took this statement to be a joke.[7]   Greco Dep. Tr. 492:19 –

493:4.

At the end of July 2007, Hashmi completed his first quarterly review of Greco's

performance.  In the review, Greco received an overall rating of 2.9.  *See* Saloman Decl., Ex. 24.

Similar to the reviews by Nettleship, Hashmi's review noted areas where Greco needed

improvement as well as areas where Greco made "a good effort." *See* Saloman Decl., Ex. 24, at

4-5.  In the next performance review, Q3 2007 Standard Review, Greco's overall rating dropped

again to a 2.0. *See* Saloman Decl., Ex. 25.  The review noted that Greco needed to improve his

"customer communications," "increase his adaptability for project successes," and that Greco

would "benefit by presenting himself as approachable." *See* Saloman Decl., Ex. 25, at 4, 7.  In

this review, Greco contended that "[t]here are serious problems with this review…and that it

does not reflect [his] true performance" *See id.* at 9.

Subsequent to the performance reviews advising Greco to work on his communication

skills, further problems with Greco's approachability were noted. In October 2007, David

Wetzel, a T-Mobile Manager complained, "we continually hit a wall with [Greco]." *See*

Saloman Decl., Ex. 26, at 2.  Similarly, another T-Mobile manager noted that an earlier issue

resulting in "email escalations…would have been avoided if [Greco] could have been a little

more customer centric." *See* Saloman Decl., Ex. 27. Likewise, when Nettleship informally

requested feedback from customers on their perception of his entire business analyst team,

several customers expressed dissatisfaction with Greco.  *See* Def. SOMF, ¶¶ 45-47.  Plaintiff

admits that those individuals conveyed these opinions.  *See* Pl. Resp. to Def. SOMF, ¶¶ 45-47.

---

[7]      Here, again, Plaintiff denies one of Defendant's Statements of Material Fact without
providing any citation to the record.  Instead, Plaintiff merely asserts that "Mr. Nettleship['s]
age-related comment was not in response to anything, his attempt at humor which initially might
cause one to laugh or smile became repetitive and insulting."  Pl. Resp. to Def. SOMF ¶ 112.

One customer noted that Greco "provides questionable customer service for the overall user and even though he may at times be learning about the business it does not appear that he is grasping the Big Picture of T-Mobile Engineering and Operations." *See* Def. SOMF, ¶ 46.  Another customer made some positive assessments, specifically; that he has been "satisfied with the end result of the first two projects" he worked "extensively" on with Greco. *See* Def. SOMF, ¶ 47. However, this same customer noted that Greco "has a very confrontational approach." *See id.*

In the performance review for the last quarter in 2007, Greco again fell below the "Achieved Expectations" threshold. *See* Saloman Decl., Ex. 34, at 7.  He received at 2.48 out of 5. *See id.*

In December 2007, Greco declined to assist a co-worker with a project because he was too busy; Plaintiff told the co-worker to do it himself.  *See* Def. SOMF, ¶ 51.  The co-worker reported it to his supervisor, who then reported it to Hashmi.  *See id.*  After Hashmi discussed this issue with Greco, Greco approached the co-worker in a public area of the office and, in an "elevated" tone expressed to the co-worker his displeasure that the co-worker had reported Greco's conduct.  *See id.* at ¶ 53.  Plaintiff admits that this conversation occurred, but denies Defendant's characterization of the conversation as a "shouting match."  *See* Pl. Resp. to Def. SOMF, ¶ 53.  The co-worker complained to Hashmi. *See id.* at ¶ 54.  Nettleship subsequently emailed Greco expressing his concerns with Greco's behavior.  *See* Saloman Decl., Ex. 32.  The email noted that "[b]ased on the account of at least one person that witnessed [the] exchange…your interaction with him was less than professional [and] later turned into a shouting match." *See id.*  Nettleship also noted, "it is now time for this to be raised to [Human Resources]." *See id.*

On January 21, 2008, Greco received a Notice for Performance Issues and Improvement Plan ("PIP"), which outlined several concerns with Greco, including his "irritation with customers," "inconsiderate…communication with customers," "unapproachable" demeanor, and "lack of trust in feedback and unwillingness to partner with management as well as others."  *See* Saloman Decl., Ex. 33.   Defendant alleges that this PIP was triggered by the December altercation.  *See* Def. SOMF, ¶ 59.  The PIP required that Greco immediately improve all areas of deficiency.  *See id.*

It was around this time that Human Resources ("H.R.") became involved.  Defendant contends that Hashmi (not Greco) was the first to involve H.R. to help coach Greco's performance deficiencies.  *See id.* at ¶ 107.  Plaintiff contends that while Hashmi was the first to involve H.R., this was at Plaintiff's urging and that it was not to help coach him.  *See* Pl. Resp. to Def. SOMF, ¶ 107.

Greco first complained to H.R. after receiving his first PIP in 2008. *See* Def. SOMF, ¶ 87; Pl. Resp. to Def. SOMF, ¶ 87.  At this time, Greco told LaTanya Kelly, an H.R. manager, that his third quarter and fourth quarter performance evaluations for 2007 were inaccurately rated and he discussed several possible reasons for this, including reprisal for poor internal survey scores, Hashmi's insecurities, and Greco's age. *See* Def. SOMF, ¶ 88; Pl. Resp. to Def. SOMF, ¶ 88.  Kelly asked Greco to provide written details about his issues and concerns.  *See* Def. SOMF, ¶ 89.  In response, Greco emailed Kelly on January 23, 2008, claiming: Hashmi is "repeatedly filled with confusion, confliction and lack of Logic;" Hashmi's "recalling of events, circumstances, and dates is very poor" and; Hashmi "has a reputation in the department of being confused, having poor memory, cannot focus, and being less than honest when challenged." *See* Saloman Decl., Ex. 47.  While Greco alleged several reasons for why Hashmi would provide an

inaccurate performance review of Greco, including age discrimination, he provided no age-based remarks or comments or any other support for the claim that Hashmi discriminated against Greco based on his age.  *See id.*

Kelly interviewed Nettleship and Hashmi about Greco on January 25, 2008.  *See* Def. SOMF, ¶ 92.  Kelly did not discuss Greco's allegations of potential age discrimination.  *See id.* at ¶ 93.  During the interview, both Nettleship and Hashmi said that Greco was a poor fit for the organization and that he had been counseled repeatedly about his communication style.  *See id.* Kelly concluded that she could not substantiate Greco's claim, noting that both Nettleship and Hashmi were over 40 and that Greco didn't contact H.R. about his age discrimination claims until after receiving a negative performance review. *See* Saloman Decl., Ex. 49.  Defendant alleges that this conclusion was communicated to Greco, *see* Def. SOMF at ¶ 95, but Plaintiff denies that this conclusion was ever relayed to him.  *See* Pl. Resp. to Def. SOMF, ¶ 95.

On February 5, 2008, Nettleship and Greco had a meeting.  *See* Kelly Aff., Ex. A.  Greco again secretly recorded the meeting.  *See* Def. SOMF, ¶ 55.  During this meeting, Greco admitted that: he "irritate[d]" customers "here and there;" he can be "pushy;" he can be "hot headed" and; he can "sometimes rub somebody the wrong way. . . ." *See* Greco Dep. Tr. 476: 18-25, 477:1-12.

After this meeting, Greco emailed Kelly complaining that Nettleship's criticism during the meeting was creating a hostile work environment. *See* Def. SOMF, ¶ 97.  Specifically, Greco claimed:

> The following themes were clearly and repeatedly communicated by Mr. Nettleship:
>
> 1. Mr. Nettleship pushed for me to state that my opinion regarding possible "alternative motives" was not what I really believed.
> 2. My manager had done nothing incorrect regardless of the timelines and facts I presented.
> 3. I would only be given minor projects and responsibility if I did not resign and/or withdraw my interaction with Human Resources.

9

4.    Mr. Nettleship was very angry that I reached out to Human Resources to help resolve these issues.

5.    My users were not satisfied with my performance and he produced a document with answers to a "survey" of all Business Analysts.

*See* Kelly Aff., Ex. A.  Defendant alleges that after receiving this email, Kelly called Nettleship and asked him questions to investigate the accusations made by Greco.[8]  *See id.* at ¶ 98; Kelly Aff., ¶ 4.  Kelly questioned Nettleship about Greco's accusation that he pushed Greco to make comments about Hashmi, Greco's accusation that Nettleship was "very angry" that Greco reached out to Human Resources and, Greco's accusation that he only be given minor projects. *See* Kelly Aff. at ¶¶ 5-7.  Nettleship told Kelly that he did not "push" Greco to say anything about Hashmi during the conversation, that he remained calm and professional during the meeting, and while it was true that he told Greco he would not be working on higher profile projects, he told Greco that this was because of a lack of confidence in his ability to get work done, not because of his communications with Human Resources. *See id.*  Kelly found Nettleship's explanation of the February 5th meeting "plausible and persuasive." *See id. at* ¶ 9. Accordingly, Kelly concluded that a hostile work environment did not exist.  *See* Kelly Aff., ¶ 11.  However, Greco contends that this conclusion was never relayed to him.  *See* Pl. Resp. to Def. SOMF, ¶ 104.

---

[8] At first blush, Plaintiff seemingly denies this, in his response to Defendant's SOMF. *See* Plaintiff's Resp. to Def. SOMF at ¶ 98.  However, Plaintiff does not specifically deny the fact that Kelly conducted an investigation; rather, he "den[ies] Ms. Kelly ever asked Mr. Nettleship to investigate allegations of discrimination." *See id.*  Defendant never alleged that Nettleship conducted an investigation; Defendant alleged only that Kelly, herself, conducted an investigation.  *See* Def. SOMF at ¶ 98.  Further, Defendant does not allege that Kelly conducted an investigation into potential age discrimination in response to Greco's email; Defendant alleges that Kelly investigated the "accusations made in Greco's February 8 email." *See id.*  As Greco did not raise potential discrimination in that email, Plaintiff did not actually deny Defendant's version of the facts—namely, that Kelly conducted an investigation.  Accordingly, this statement is uncontested and taken as true.

On February 27, 2008, Greco was placed on a second PIP.  *See* Def. SOMF, ¶ 68. Defendant alleges that Greco's ongoing performance issues and a specific incident that occurred in early February triggered this PIP.  *See id.*  Specifically, Defendant alleges that Greco turned off a "widely used query from an existing application without notifying the customers, evaluating the impacts of his action, or getting involved in correcting the problem he created," resulting in numerous complaints from T-Mobile end users.[9]  *See id.* at ¶ 67.  Greco alleges that he was not placed on the PIP because of this incident.  *See* Pl. Resp. to Def. SOMF, ¶ 67.  Greco contends that he was authorized to turn off the query and that he did so because "the old system had bugs and was defective, and an improved system had been implemented, and all employees needed to be on it. . . ." *See id.*

Nevertheless, the PIP was, in fact, issued.  Greco reviewed this PIP with Hashmi and Kelly. *See id.* at ¶ 68. On March 11, 2008, Greco emailed Kelly to inform her that there were no further discussions with his managers since the PIP was issued and to ask her for her "opinion as to whether he should try to set up a meeting with his supervisors."  *See* Saloman Decl., Ex. 37. Greco also expressed ongoing concerns about his relationship with management, contending that "[e]verything appears to be going fine with my performance and interaction with my manager (and department manager), then what appears to me [sic] 'out of nowhere,' I am told I have failed terrifically at a major objective." *See id.*

Defendant alleges that a month after this PIP was issued, on April 2, 2008, Greco was involved in a verbal altercation with a customer during a conference call.  Both Hashmi and Nettleship, along with T-Mobile customer Andy Sheahan, were on the call.  *See* Def. SOMF, ¶

---

[9] "End users" are those who "regularly use the query to conduct their business." *See* Def. SOMF at ¶ 67. Defendant contends that because of Greco's action these end users were suddenly unable to conduct the business they use this query to conduct. *See id.*

70.  Defendant claims that Greco's "uncollegial and disruptive behavior on this call escalated to the point where Hashmi had to request that Greco limit his remarks—a request Greco ignored [and that] Nettleship then had to leave his office and enter the room from which the call originated in order to instruct Greco face-to-face to stand down."  *See id.* at ¶ 71.  This altercation was memorialized in an email from Nettleship to Kelly in the H.R. department in which Nettleship described the alteration as "a childish 'pissing' contest."  Saloman Decl., Ex. 39.  Plaintiff denies that he acted as Defendant describes, contending that "he did nothing wrong."  *See* Pl. Resp. to Def. SOMF, ¶¶ 70-73.

Greco's Performance Review for the first quarter of 2008 again provided an overall score below the "Achieved Expectations" threshold. *See* Saloman Decl., Ex. 43, at 7.  However, his overall score, 2.78, was higher than the overall score of the previous quarter.  *See id; see also* Saloman Decl., Ex. 34 at 7.

Subsequently, on May 2, 2008, Greco received a Decision Time Notice that memorialized "Greco's shut down of the query without notice to users on February 7, his unprofessional communications with Sheahan on April 2, and his failure to meet customer service and other business objectives." *See* Def. SOMF, ¶ 75; Saloman Decl., Ex. 41.  Greco understood that in response to this Decision Time Notice he had a probationary 60-day period to commit to immediate improvement and to meet all clearly defined objectives, and that if he did not, he would be terminated.  *See* Def. SOMF, ¶ 76; Pl. Resp. to Def. SOMF, ¶ 76; Greco Dep. Tr. 530:4-13.  In Greco's written response to the Decision Time Notice, he wrote that he would "address all of the issues that have been identified. . . ." *See* Saloman Decl., Ex. 77.

Defendants allege that just one month after the Decision Time Notice was issued, Greco acted inappropriately during a meeting when he became noticeably angry and insulted a team

12

member. *See* Def. SOMF, ¶ 80.  While Greco denies that he acted inappropriately, *see* Pl. Resp. to Def. SOMF, ¶ 79-80, during his deposition he admitted to accusing a team member of "taking a half day's worth of work and turning it into a six month project" during this meeting.  *See* Greco Dep. Tr. 544:11-18.

This alleged interaction, and a recommendation that Greco's employment be terminated, were conveyed to Kelly and her supervisor, Senior Human Resources Manager Tamara Smith. *See* Def. SOMF, ¶ 81.  Defendant alleges that Nettleship recommended that Greco's employment be terminated.  *See id.*  However, Plaintiff denies this, contending that Hashmi terminated his employment.  *See* Pl. Resp. to Def. SOMF, ¶ 81.  It is undisputed, however, that John Lohe, Nettleship's supervisor, asked for H. R.'s support in terminating Greco's employment because Greco "was not meeting the commitments he made in the Decision Time Notice." *See* Def. SOMF, ¶ 82.  However, Lohe admitted that he did not "have any involvement in the implementation of the decision by Atiq Hashme [*sic*] to fire Mark Greco." *See* Lohe Dep. Tr. 47:2-8.

The decision to terminate Greco was then made.  *See* Def. SOMF, ¶ 84.  Defendant contends that Nettleship and Hashmi made this decision, with the support of Lohe, Kelly, and Smith. *See id.*  However, Plaintiff alleges that the decision was "clearly Mr. Hashmi's," which was "rallied behind by Mr. Nettleship and supported by Mr. Lohe," while "Ms. Kelly of H.R. was doing her job to get it done." *See* Pl. Resp. to Def. SOMF, ¶ 84.  On June 20, 2008, Greco's employment was terminated.  *See id.* at 85.

On January 22, 2009, Greco filed this suit in the Superior Court of New Jersey, Law Division, Somerset County.  Defendant removed the suit to this Court on March 4, 2009. Shortly thereafter, an amended complaint was filed in this Court on March 10, 2009 and Defendant filed

a timely answer.  Following the completion of discovery, Defendant filed the instant motion for summary judgment.

## DISCUSSION

### I.        Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 482 n. 1 (3d Cir.2001) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *accord Fed. R.Civ.P.* 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir.2006); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Curley v. Klem,* 298 F.3d 271, 276-77 (3d Cir.2002). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." *Kaucher,* 455 F.3d at 423. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.,* 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.; Maidenbaum v. Bally's Park Place, Inc.,* 870 F.Supp. 1254, 1258

(D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson,* 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or ... vague statements ...' " *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs.,* 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence,* 396 F.3d 314, 319 (3d Cir.2005). Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.   *Anderson,* 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992).

## II.  Sham Affidavit Doctrine

As a preliminary manner, Defendant contends that Greco's certification, submitted in connection with his opposition to the instant motion, is a sham affidavit that should be disregarded.  "The 'sham affidavit' doctrine refers to the…'practice of disregarding an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit

contradicts the affiant's prior deposition testimony.'" *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (*quoting Shelcusky v. Garjulio,* 172 N.J. 185 (2002)).   Thus, if Plaintiff submits an affidavit that directly contradicts a statement he previously made, the affidavit will be ignored.

Defendant argues that Greco's averment in his certification that "more senior, older and more experienced employees" were fired by T-Mobile contradicts his earlier deposition testimony that it was only a "possibility" that those employees were fired on account of their age. *See* Def. Reply at 3.   However, this Court "cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition."   *Baer v. Chase*, 392 F.3d at 625.   As explained by the New Jersey Supreme Court, "[c]ourts should not reject alleged sham affidavits where the contradiction is reasonably explained, where an affidavit does not contradict patently and sharply the earlier deposition testimony, or where confusion or lack of clarity existed at the time of the deposition questioning and the affidavit reasonably clarifies the affiant's earlier statement." *Shelcusky v. Garjulio,* 172 N.J. at 201-02.   In my view, Greco's averment in his certification does not sharply contradict his deposition testimony.   That Greco now avers that the firing of other older employees was due to their age is not wholly inconsistent with his prior testimony that age discrimination was a possibility.   For this reason, I will not apply the sham affidavit doctrine to Greco's certification.   Rather, I will reference his certification where appropriate in connection with my evaluation of the merits of his claims.

### III.  New Jersey's Law Against Discrimination

New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-12(a), makes it unlawful "[f]or an employer, because of the ... age ... of any individual ... to discriminate against such individual in compensation or in terms, conditions, or privileges of employment[.]" Section

12(d) of the NJLAD prohibits retaliation against an employee because that employee "has opposed any practices or acts forbidden under [the NJLAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the NJLAD.]"

New Jersey courts look to federal law as a key source of interpretative authority in a variety of contexts involving alleged unlawful discrimination. *See, e.g., Erickson v. Marsh & McLennan,* 117 N.J. 539, 551 (1990) (applying Title VII analysis to NJLAD discrimination claim); *Goodman v. London Metals Exch.,* 86 N.J. 19, 31 (1981) (applying Title VII analysis to NJLAD claim alleging sex); *Peper v. Princeton Univ.,* 77 N.J. 55, 82-83 (1978) (applying Title VII analysis to NJLAD claim alleging sex discrimination); *Clowes v. Terminex Int'l,* 109 N.J. 575, 595-96 (1988) (applying Title VII to NJLAD claim alleging discriminatory termination of plaintiff because of alcoholism). Further, New Jersey has adopted the United States' Supreme Court's analytical framework of unlawful discrimination claims brought under Title VII of the Civil Rights Act of 1964, and specifically, the procedural burden-shifting methodology articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Zive v. Stanley Roberts Inc.*, 182 N.J. 436, 447 (2005). And, both New Jersey and Third Circuit case law make clear that the *McDonnell Douglas* paradigm applies to age discrimination cases at the summary judgment stage. *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009); *see Young v. Hobart West Grp.*, 385 N.J.Super. 448, 459-60 (App. Div. 2005) (applying *McDonnell Douglas* framework).

The *McDonnell Douglas* framework consists of three prongs. First, the plaintiff must establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802. Then the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 802-803. The employer is faced with a

"relatively light burden" and the employer "need not prove that the tendered reason *actually* motivated its behavior." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994). Finally, if a nondiscriminatory reason is shown, the burden shifts back to the plaintiff to produce evidence that shows that the employer's proffered reason is pretextual. *Id.* Notably, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 459 U.S. 248, 253 (1981); *see Smith*, 589 F.3d at 691.

### A. Age Discrimination

In order to make a prima facie case of age discrimination under the NJLAD, a plaintiff must demonstrate that she (1) is a member of the protected class, (2) was qualified for the position held, (3) suffered an adverse employment action,[10] and (4) "ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination." *Monaco v. American General Assur. Co.,* 359 F.3d 296, 300 (3d Cir. 2004) (holding that the elements of a prima facie case under the NJLAD are the same as those under the federal ADEA). *See also Nini v. Mercer*

---

[10]  The Adverse employment action complained of is Greco's termination. *See* Complaint at 3. While Plaintiff does not allege in his complaint or pleadings that not being considered for Hashmi's position when it was available was an "adverse employment action," Plaintiff does make several references to this incident. Specifically, Plaintiff contends that his objection to not being considered for the position "is not simply that [he] wasn't given the opportunity to compete for this position, but that another employee, also older than forty, Ms. Moitoza, was also precluded. . . ." Greco Cert., ¶ 6. Notably, even if Plaintiff seeks to make this claim, he fails to establish a *prima facie* case, as Plaintiff, himself, admitted that he was not qualified for the position, failing to meet the "qualified for the position held" prong that is necessary to establish a *prima facie* case of discrimination. *See* Greco Dep. Tr. 224:8-17. Plaintiff makes additional blanket assertions, in his opposition, that Defendant discriminated against him by, *inter alia*, giving him poor evaluations and failing to fully investigate Hashmi's and Nettleship's allegedly discriminatory comments. *See* Pl. Opp. at 3. He does not point to any case law, however, that suggests these actions constitute adverse employment actions. Thus, the Court will not consider these allegedly discriminatory actions to be adverse employment actions.

*County Community College*, 406 N.J.Super. 547, 554 (App. Div. 2009) *aff'd* 202 N.J. 98 (2010)

("In the case of age discrimination, the fourth element 'require[s] a showing that the plaintiff was

replaced with a candidate sufficiently younger to permit an inference of age discrimination.'")

(internal quotation marks omitted).

Defendant's *prima facie* arguments center on the fourth element, contending that Greco

failed to adduce evidence that a significantly younger person replaced him.  Indeed, Plaintiff has

not pointed to competent evidence that he was replaced by a significantly younger person or any

person at all.  Plaintiff alleges that two younger employees were hired "in *anticipation* of [his]

termination." Greco Cert., ¶ 13.   This bare allegation establishes only that T-Mobile hired

additional analysts prior to Plaintiff's termination, not that these analysts *replaced* him.  And, on

a summary judgment motion, the Court will not give credence to bare allegations by the Plaintiff

that essentially amount to "self-serving conclusions," unsupported by specific facts in the record.

*See Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 (3d Cir. 1990).  The only record citation

Plaintiff provides for this position is the deposition of Moitoza, a project manager at T-Mobile.

*See id.*   However, the cited deposition transcript shows that Moitoza states merely that other

analysts were hired; she did not say that these analysts were hired to replace Plaintiff.   *See*

Moitoza Dep. Tr. 40:10 – 42:25.  Rather, Moitoza testified that four business analysts under the

age of 40 were hired—Rogi Nagam, Tracy Lake, Madhuri Bhaskar, and "Latha."  She does not

specify, in her testimony, when these individuals were hired nor does she state that they were

hired in anticipation of replacing Plaintiff.  Hence Plaintiff has referenced no specific facts in the

record that suggest any individual was hired to replace him and his bare, unsubstantiated

allegation is insufficient to create an inference of unlawful discrimination.  *Monaco v. American*

*General Assur. Co.,* 359 F.3d at 300.  Accordingly, Plaintiff has failed to establish a *prima facie* case of age discrimination. [11]

Even assuming, *arguendo,* that Plaintiff has met his burden to establish a *prima facie* case, Defendant has stated a legitimate, nondiscriminatory reason for its actions, and Plaintiff has not met the burden of showing that this reason was pretexual.  The considerable record is replete with facts supporting Defendant's position, that Plaintiff was terminated due to his unacceptable work performance, including:  several performance reviews on which Plaintiff failed to meet the "Achieved Expectations" threshold (*See, e.g.*, Saloman Decl., Ex. 19; Saloman Decl., Ex. 24), an Employee Corrective Action Notification for Mark Greco issued in 2007 (*See* Saloman Decl., Ex. 21), and two Performance Issues and Improvement Plans ("PIP") (*See* Saloman Decl., Ex. 33; *See* Def. SOMF, ¶ 68.).

While Plaintiff blames Hashmi for his allegedly unlawful termination,[12] Defendant has established that concerns with Greco's performance, and specifically, his communications skills,

---

[11]  With respect to the fourth element, the Court notes that a recent unpublished New Jersey Appellate Division decision states that a NJLAD age-discrimination plaintiff is not required to show that he was replaced by a sufficiently younger employee.  Rather, it is adequate for a plaintiff to show that "the employer sought another to perform the same work after the [plaintiff] had been removed from the position," whether or not that individual was older or younger than the plaintiff.  *Winkel v. Spencer Gifts, LLC*, Docket Number L-4494-05, 2010 WL 6090, *6 (App. Div., Jan. 4, 2010).  While this Court is bound to follow New Jersey law in ruling on Plaintiff's NJLAD claim, *Winkel* does not alter my analysis here.  For one, *Winkel* is an unpublished, non-binding decision.  Further, Plaintiff does not dispute the sufficiently younger requirement.  In addition, for the reasons explained *supra*, my analysis focuses on Plaintiff's failure to point to competent evidence demonstrating that he was replaced by *any* employee.  Thus, even under *Winkel*, Plaintiff's unsubstantiated contentions would not withstand summary judgment.

[12]  *See* Greco Cert., ¶ 11 (Plaintiff asserts that the "truth" behind his firing "is that Mr. Hashmi was over his head, insecure and threatened by more experienced and senior employees and contractors, and was driven to be surrounded by younger and less experienced employees who did not challenge his authority but, instead, provided unquestioned allegiance, which Plaintiff did not.").

were raised before Hashmi was hired.  *See* Saloman Decl., Ex. 18 at 3-4 (Performance Review completed by Nettleship notes that Greco "needs to be careful to be sure to modify his approach based on the people he was dealing with."); *See* Saloman Decl., Ex. 20, at 3, 9 (Performance Review completed by Nettleship gives Greco a below "Achieved Expectations" rating, and notes that Greco "has not made the professional relationships required to be successful in his position.")   Accordingly, Defendant has met its burden to articulate a legitimate, nondiscriminatory reason for the termination of Greco's employment. *See Finn v. J.B. Hunt Transport Services, Inc.*, Civil Action No. 07-4851, 2009 WL 2058850, *5 (D.N.J. July 7, 2009) ("Defendants state that Plaintiff was fired because he did not perform his duties well, or in plain language, that he was not good at his job and that he repeatedly failed to make the necessary improvements after being cautioned that such improvements were necessary. This is a legitimate reason that would justify Plaintiff's termination.")

Plaintiff only makes bare allegations of a discriminatory pretext[13] and fails to point to evidence that "demonstrate[s] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Fuentes,* 32 F.3d at 765

---

[13]  For example, Plaintiff alleges that he and another coworker noticed an "emerging pattern by Defendant causing more senior, older, and more experienced employees, to quit or be fired, as part of what was an open and notorious plan to purge the older in favor of the younger." *See* Greco Cert., ¶ 7.   However, Plaintiff provides no support for this proposition.  Plaintiff only references is an email he sent to Kelly in which he lists a number of employees and suggests that she "might want to pull files for the people listed below and examine them and/or contact them." *See* Plaintiff's Ex. 7. However, the email does not allege that these are employees are being discriminated against, nor is there any indication that these persons were, in fact, discriminated against. Similarly, *Id.* at ¶ 11.  Again, Plaintiff provides no support for this claim.

(internal citations omitted).  While Plaintiff has made general allegations that his supervisors repeatedly made age-based comments, he provides evidence of only two such comments: when Hashmi asked Greco whether the problems they were experiencing stemmed from "[Greco] being older than [Hashmi]," *See* Def. SOMF, ¶ 109, and when Nettleship asked the crowd at a meeting whether he should "increase the font size for those of us over forty," while operating a projector.  *See* Greco Cert., ¶ 20.

With regard to Hashmi's comment, which Hashmi noted referred to Greco being at the company longer than Hashmi, and not Greco's age, *See* Def. SOMF, ¶ 109, such a stray remark, made approximately one year before Greco was actually terminated, is insufficient to demonstrate pretext.  *See Hyland v. American Intern. Group*, 360 Fed.Appx. 365, 367 (3d Cir. 2010) (affirming that a stray remark referring to Plaintiff as the "old man" of the operation, made 10 months prior to Plaintiff's termination, could not support an inference of age discrimination.); *Heck v. American Multi-Cinema, Inc.,* Civil Action No. 07-4915, 2009 WL 540685 (D.N.J. Mar. 4, 2009) (supervisor's comments, including that plaintiff "had been around forever" and was "from the old school," "may have been referring to plaintiff's level of experience," and were stray comments "attenuated from the termination decision" that were not enough to survive summary judgment.).

Similarly, Nettleship's remark is insufficient to establish pretext as the remark was made to a group of people, had nothing to do with Greco's age, clearly seems to have been said in jest, and Nettleship included himself in the group.  *Cf. Lincoln v. Momentum Sys. Ltd.*, 86 F. Supp. 2d 421, 432 (D.N.J. 2000) (supervisor's comment that they are "typically looking for people who are kind of fresh and young," was stray remark that did not raise reasonable inference of age discrimination.)  Greco points to Moitoza's deposition testimony in support of his contention that

Nettleship made similar jokes on more than one occasion, that he was not including himself in the category of those over 40, and that his jokes were repetitive.  It is true that Moitoza testified that Nettleship made similar comments ten to fifteen times over the six to eight month timeframe during which Moitoza worked with Nettleship.  However, her testimony does not specify how that time frame corresponds with Greco's termination.  As for Greco's contention that Nettleship did not include himself in the "over 40" category, Moitoza's testimony does not support Greco's contention.  Her testimony provides:

> Q:      Do you have a recollection of any of the specific comments that [Nettleship] made?
>
> A:      There were comments about maybe adjusting the font size on the projector.
>
> Q:      What would he say about that?
>
> A:      Should I increase the font size for those of us over 40.

Moitoza Dep. Tr. 51:19-25.  Greco argues that her reference to "us" referred to herself and other persons over 40 years of age.  To the contrary, the natural reading of her testimony is that she was paraphrasing what Nettleship said, such that when Nettleship stated "Should I increase the font size for those of us over 40," he was referring to himself in that age-based category.  Moreover, Moitoza's comment that Nettleship's jokes "got repetitive" refers to non-age related jokes he made about her lack of hearing in her right ear.  *See id.* at 53:1-12.  Finally, Moitoza averred in her deposition that Nettleship's statements regarding the projector were "definitely [made] in jest."  *Id.* at 52:20-25.

On this record, I find the following language from *Hyland* equally applicable here:  "it would be unfortunate if the courts forced the adoption of an employment culture that required everyone in the structure to be careful so that every remark made every day passes the

employment equivalent of being politically correct lest it be used later against the employer in litigation." *Hyland v. American Intern. Group*, 360 Fed.Appx. at 367.[14]  Having pointed to no competent evidence from which an inference of age discrimination could be drawn, or that Defendant's reasons for terminating him were pretextual, summary judgment must be granted on Plaintiff's age discrimination claim.

### B. Retaliation

Under the NJLAD, a plaintiff makes out a *prima facie* case of retaliation by showing "(1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action." *Cardenas v. Massey,* 269 F.3d 251, 263 (3d Cir. 2001) (citations omitted). Although a plaintiff need not file a formal complaint of discrimination to meet the first prong of this analysis, "to constitute protected activity, the opposition, complaint or protest, whether formal or informal, must clearly indicate a belief that an act forbidden by the NJLAD has occurred." *Hood v. Pfizer,* Civ. Action No. 04-3836 (SRC), 2007 WL 2892687, *19 (D.N.J. 2007) *aff'd* 322 Fed.Appx. 124, 130 (3d Cir. 2009).  By way of example, the Third Circuit has held that a "statement complaining about [a] fellow employee's specific comments and made to that employee's supervisor in front of that employee, constitutes protected conduct."  *Hood,* 322 Fed.Appx. at 130.  Complaints about unfair treatment in general, however, do not constitute protected activity.  *Id.*

---

[14]   Furthermore, that because Plaintiff was hired when he was 49 and fired when he was 51, creates an inference *against* age discrimination.  *See Young,* 385 N.J.Super. at 461 ("Courts have rejected age discrimination claims when a plaintiff was both hired and fired while a member of the protected age group" (citations omitted)).

First of all, Plaintiff's Opposition is devoid of any arguments countering Defendant's motion for summary judgment on this issue. Accordingly, summary judgment could be granted based solely on Plaintiff's failure to identify specific facts and affirmative evidence that contradict those offered by Defendant. *Anderson,* 477 U.S. at 256-57. In addition, a review of the record shows that the only potential "protected activity" was Plaintiff's email to Kelly providing several potential reasons for his allegation that Hashmi was inaccurately completing performance reviews of Plaintiff. However, in that email, Plaintiff only made a vague reference to "age discrimination" as part of a list of "possible reasons for [Hashmi's] behavior," and failed to put forth any specific age-based remarks. *See* Saloman Decl., Ex. 47. Such a comment is not the type of "particularized statement targeting a discrete past event that" is a protected anti-retaliation activity. *Hood,* 332 Fed.Appx. at 131. Accordingly, summary judgment is appropriate on Plaintiff's retaliation claim.

## C. Hostile Work Environment

Under NJLAD, a plaintiff makes out a hostile work environment claim by showing "(1) that the conduct would not have occurred but for the employee's protected class and that the conduct was '(2) severe or pervasive enough to make a (3) a reasonable [member of the protected class] believe that (4) the conditions of employment were altered and that the working environment is hostile or abusive.'" *Thomas v. United Parcel Service, Inc.,* No. 07-5607, 2010 WL 3636230, *5 (D.N.J. Sept. 9, 2010) (*citing Lehmann v. Toys R Us, Inc.,* 132 N.J. 587 (1993)). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' a hostile work environment is created. *Harris v. Forklift Sys.,*

*Inc.,* 510 U.S. 17, 23 (1993) (citations omitted).  That is, "[h]ostile work environment claims . . . are designed for work environments characterized by an *excess* of discriminatory ridicule or other intimidating behavior."  *Sgro v. Bloomberg*, 331 Fed.Appx. 932, 941 (3d Cir. 2009) (emphasis added).   The considerable record here is devoid of facts evincing such an atmosphere—Plaintiff has referred only to a few, stray comments made in jest.  Although even a single comment may suffice to demonstrate that a work environment is hostile, *Thomas*, 2010 WL 3636230, *7 (citing *Lehmann*, 132 N.J. at 606-07), the comments here were not so severe or pervasive as to suggest that the T-Mobile's work environment was hostile towards older workers.  Further, as with his retaliation claim, Plaintiff makes no arguments in his opposition papers countering Defendant's motion for summary judgment on this issue.   Accordingly, Summary Judgment is granted on the hostile work environment claim.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted in its entirety.

/s/ Freda L. Wolfson
Freda L. Wolfson, U.S.D.J

Dated:  December 1, 2010

26